**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| ASTORIA FINANCIAL CORPORATION, RALPH F. PALLESCHI, MONTE N. REDMAN, JOHN R. CHRIN, JOHN J. CORRADO, ROBERT GIAMBRONE, GERARD C. KEEGAN, BRIAN M. LEENEY, PATRICIA M. NAZEMETZ, and STERLING BANCORP, | ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action stems from a proposed transaction announced on March 7, 2017 (the "Proposed Transaction"), pursuant to which Astoria Financial Corporation ("Astoria" or the "Company") will be acquired by Sterling Bancorp ("Sterling").

2. On March 6, 2017, Astoria's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Sterling. Pursuant to the terms of the Merger Agreement, shareholders of Astoria will receive 0.875 shares of Sterling common stock for each share of Astoria stock they own.

3.      On March 6, 2017, the last trading day before public announcement of the Proposed Transaction, the 0.875 exchange ratio represented approximately $21.92 in value for each share of Astoria common stock.   However, since that time, Sterling's stock price has dropped, thus resulting in a lower implied merger consideration.   For example, on March 22, 2017, the implied merger consideration for Astoria's common stock was only $19.91 per share. The Board did not negotiate for a collar that would protect Astoria's stockholders from this foreseeable decline in Sterling's stock price.

4.      On April 5, 2016, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

5.      The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the

transactions and wrongs complained of herein occurred in this District.

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Astoria common stock.

10.      Defendant Astoria is a Delaware corporation and maintains its principal executive office at One Astoria Bank Plaza, Lake Success, New York 11042.  Astoria's common stock is traded on the NYSE under the ticker symbol "AF."

11.      Defendant Ralph F. Palleschi ("Palleschi") has served as a director of Astoria since 1996 and as Chairman of the Board since June 2012.   According to the Company's website, Palleschi is Chair of the Nominating and Corporate Governance Committee and a member of both the Audit Committee and the Compensation Committee.

12.      Defendant Monte N. Redman ("Redman") has served as a director, President, and Chief Executive Officer ("CEO") of Astoria since July 2011.

13.      Defendant John R. Chrin ("Chrin") has served as a director of Astoria since December 2009.  According to the Company's website, Chrin is Chair of the Audit Committee and a member of the Compensation Committee.

14.      Defendant John J. Corrado ("Corrado") has served as a director of Astoria since September 2012.   According to the Company's website, Corrado is a member of the Audit Committee and the Compensation Committee.

15.      Defendant Robert Giambrone ("Giambrone") has served as a director of Astoria since July 2015.   According to the Company's website, Giambrone is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

16.      Defendant Gerard C. Keegan ("Keegan") has served as a director of Astoria since

January 2012.

17.     Defendant Brian M. Leeney ("Leeney") has served as a director of Astoria since August 2009.  According to the Company's website, Leeney is the Chair of the Enterprise and Risk Management Committee and is a member of both the Nominating and Corporate Governance Committee and the Compensation Committee.

18.     Defendant Patricia M. Nazemetz ("Nazemetz") has served as a director of Astoria since January 2013.  According to the Company's website, Nazemetz is the Chair of the Compensation Committee and a member of both the Audit Committee and the Nominating and Corporate Governance Committee.

19.     The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

20.     Defendant Sterling is a Delaware corporation, a party to the Merger Agreement, and maintains its principal executive office at 400 Rella Boulevard, Montebello, New York 10901.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Astoria (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22.     This action is properly maintainable as a class action.

23.     The Class is so numerous that joinder of all members is impracticable.  As of March 6, 2017, there were approximately 101,227,573 shares of Astoria common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

24.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

25.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company and the Proposed Transaction***

28.     Astoria, with assets of $14.6 billion, is the holding company for Astoria Bank.

29.     Established in 1888, Astoria Bank, with deposits in New York totaling $8.9 billion, is the second largest thrift depository in New York and provides the customers and local

communities it serves with quality financial products and services through 88 convenient banking branch locations, a business banking office in Manhattan, and multiple delivery channels, including its flexible mobile banking app.

30.     Astoria Bank commands a significant deposit market share in the attractive Long Island market, which includes Brooklyn, Queens, Nassau, and Suffolk counties with a population exceeding that of 38 individual states.

31.     Astoria Bank originates multi-family and commercial real estate loans, primarily on rent controlled and rent stabilized apartment buildings, located in New York City and the surrounding metropolitan area and originates residential mortgage loans through its banking and loan production offices in New York, a broker network in four states, primarily along the East Coast, and correspondent relationships covering 13 states and the District of Columbia.

***The Process Leading to the Proposed Transaction***

32.     On October 29, 2015, Astoria and New York Community Bancorp, Inc. ("NYCB") announced that they had entered into a definitive merger agreement, dated as of October 28, 2015, pursuant to which Astoria would merge with and into NYCB, and each outstanding share of Astoria common stock would be converted into one share of NYCB common stock and cash.  The NYCB merger agreement provided, among other items, that either party could terminate the agreement if the merger was not consummated on or before December 31, 2016.

33.     On December 20, 2016, NYCB and Astoria jointly announced that their boards of directors mutually agreed not to extend the companies' definitive merger agreement, and that the merger agreement would be terminated effective January 1, 2017.

34.     On January 3, 2017, after learning that NYCB and Astoria had publicly

announced the termination of their merger agreement, Jack Kopnisky ("Kopnisky"), the President and CEO of Sterling, contacted Redman, the President and CEO of Astoria, to express Sterling's interest in exploring a potential strategic transaction with Astoria.  Around that time, representatives of Astoria were contacted by two other parties, "Party B" and "Party C," to express potential interest in a transaction with Astoria.

35.     On January 25, 2017, the Board met and discussed Astoria's strategic plans as well as the expressions of interest received by the Board's financial advisor, Sandler O'Neill & Partners, L.P. ("Sandler O'Neill").  During the meeting, the Board directed management and Sandler O'Neill to continue discussions with the parties that had expressed interest in a potential business combination.

36.     On February 8, 2017, Astoria and Party B executed a mutual confidentiality agreement that contained standstill provisions. According to the Registration Statement, the "confidentiality agreement provided for the standstill to automatically terminate if Astoria entered into an agreement with a third party providing for an acquisition of a majority of Astoria's voting securities or all or substantially all of Astoria's assets."  Party B subsequently ceased regular contact on a potential transaction, and did not proceed with diligence or otherwise communicate any definitive expression of interest for reasons undisclosed in the Registration Statement.

37.     On February 15, 2017, Sterling delivered a written indication of interest to Sandler O'Neill. Sterling proposed a fixed exchange ratio of 0.865 of a share of Sterling common stock for each outstanding share of Astoria common stock, which, based on the then-current trading price of Sterling's common stock would provide consideration with a value of $21.02 per share of Astoria common stock.  Sterling's letter also indicated that it would intend

to appoint two representatives from Astoria's board of directors to Sterling's board of directors in connection with the transaction.

38.    On February 21, 2017, Astoria executed a mutual confidentiality agreement with standstill provisions with Sterling.

39.    On February 21, 2017, Party C delivered a written indication of interest to Sandler O'Neil. Party C proposed a range of fixed exchange ratios, which, based on the then-current trading price of Party C's common stock would provide consideration with a value of $21.11 to $23.03.  Party C noted that it would be willing to include cash up to 10% of the transaction consideration at Astoria's request.

40.    Following the receipt of Sterling's and Party C's proposals, Astoria made available to each of Sterling and Party C certain due diligence materials in an electronic data room.  Astoria also coordinated reciprocal due diligence investigations of each interested party.

41.    On February 24, 2017, Astoria executed a mutual confidentiality agreement with standstill provisions with Party C.  The Registration Statement fails to disclose whether Party C's confidentiality agreement also contains a "don't ask, don't waive" provision that is preventing Company A from submitting a superior offer to acquire the Company, and whether the standstill and/or "don't ask, don't waive" provision terminate following the announcement of an acquisition.

42.    On February 27, 2017, the Board met to discuss the potential business combination with Sterling, and only Sterling.  The Board invited Mr. Kopnisky to discuss Sterling's proposed combination and strategic vision for the combined company. Following the meeting, the Board determined to move forward with Sterling's proposal, despite the fact that it was lower than Party C's proposed merger consideration.   The Board also authorized the

Company to enter into an exclusivity agreement with Sterling.

43.     On February 28, 2017, representatives of Sterling delivered a final verbal proposal for a fixed exchange ratio of 0.875, which, based on the then-current trading price of Sterling's common stock would provide consideration with a value of $21.83 per share of Astoria common stock.  Sterling also indicated that it would agree to appoint four representatives from Astoria's board of directors to Sterling's board of directors in connection with the transaction.  Astoria and Sterling subsequently executed an exclusivity agreement dated February 28, 2017, with an exclusivity period that ran through March 15, 2017.

44.     During the exclusivity period, Party C sent a letter to Astoria management to convey Party C's continued interest in a transaction at the previously communicated fixed exchange ratio.

45.     On March 6, 2017, the Sterling board of directors met to consider approval of the Merger Agreement.  During the meeting, the Sterling board received presentations from its financial advisors in connection with the Proposed Transaction, RBC Capital Markets, LLC ("RBCCM") and Citigroup Global Markets Inc. ("Citi"), but the Registration Statement fails to disclose a fair summary of those analyses, including their key inputs and other material information.  Following these presentations, the Sterling board approved the Merger Agreement and the Proposed Transaction.

46.     Also on March 6, 2017, the Astoria Board met to discuss and approve the Proposed Transaction.  During the meeting, Sandler O'Neill presented the Board with its valuation analyses, although a fair summary of those analyses, including their key inputs and other material information, are not contained in the Registration Statement.  Following this presentation, the Astoria Board approved the Merger Agreement and the Proposed Transaction.

47.     On the evening of March 6, 2017, the parties finalized and executed the Merger Agreement. On the morning of March 7, 2017, Astoria and Sterling issued a joint press release announcing the execution of the Merger Agreement.

***The Preclusive Terms of the Merger Agreement***

48.     The Board caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

49.     To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Sterling and are calculated to unreasonably dissuade potential suitors from making competing offers.

50.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 6.12(a) of the Merger Agreement states:

> (a) The Company agrees that it will not, and will cause its Subsidiaries and use its reasonable best efforts to cause its and their officers, directors, agents, advisors and representatives (collectively, "Representatives") not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or knowingly facilitate inquiries or proposals with respect to any Acquisition Proposal, (ii) engage or participate in any negotiations with any person concerning any Acquisition Proposal, or (iii) provide any confidential or nonpublic information or data to, or have or participate in any discussions with, any person relating to any Acquisition Proposal, except to notify a person that has made or, to the knowledge of the Company, is making any inquiries with respect to, or is considering making, an Acquisition Proposal, of the existence of the provisions of this Section 6.12(a). . . . The Company will, and will use its reasonable best efforts to cause its Representatives to, immediately cease and cause to be terminated any activities, discussions or negotiations conducted before the date of this Agreement with any person other than Parent with respect to any Acquisition Proposal. . . .

51.     Additionally, the Board has agreed in Section 6.12(a) that the Company "shall use its reasonable best efforts to enforce any existing confidentiality or standstill agreements to which it or any of its Subsidiaries is a party in accordance with the terms thereof."

52.     Further, the Company must promptly, and within twenty-four hours, advise Sterling of any proposals or inquiries received from other parties.  Section 6.12(a) of the Merger Agreement states in pertinent part:

> The Company will promptly (within twenty-four (24) hours) advise Parent following receipt of any Acquisition Proposal or any inquiry which could reasonably be expected to lead to an Acquisition Proposal, and the substance thereof (including the material terms and conditions of and the identity of the person making such inquiry or Acquisition Proposal), and will keep Parent reasonably apprised of any related developments, discussions and negotiations on a current basis, including any amendments to or revisions of the material terms of such inquiry or Acquisition Proposal.

53.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Sterling a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.3 of the Merger Agreement provides in pertinent part:

> [S]ubject to Sections 8.1 and 8.2, if the Board of Directors of the Company or Parent, after receiving the advice of its outside counsel, determines in good faith that it would be more likely than not to result in a violation of its fiduciary duties under applicable law to continue to recommend this Agreement, then in submitting this Agreement to its stockholders, such Board of Directors may (but shall not be required to) submit this Agreement to its stockholders without recommendation (although the resolutions approving this Agreement as of the date hereof may not be rescinded or amended), in which event the Board of Directors may communicate the basis for its lack of a recommendation to its stockholders in the Joint Proxy Statement or an appropriate amendment or supplement thereto to the extent required by law; *provided*, that neither Board of Directors may take any actions under this sentence unless (i) it gives the other party at least three (3) business days' prior written notice of its intention to take such action and a reasonable description of the event or circumstances giving rise to its determination to take such action (including, in the event such action is

taken by the Board of Directors of the Company in response to an Acquisition Proposal, the latest material terms and conditions of, and the identity of the third party making, any such Acquisition Proposal, or any amendment or modification thereof, or describe in reasonable detail such other event or circumstances) and (ii) at the end of such notice period, the applicable Board of Directors takes into account any amendment or modification to this Agreement proposed by the other party and after receiving the advice of its outside counsel, determines in good faith that it would nevertheless be more likely than not to result in a violation of its fiduciary duties under applicable law to continue to recommend this Agreement. . . .

54. Further locking up control of the Company in favor of Sterling, the Merger Agreement provides for a "termination fee" of $75.7 million, payable by the Company to Sterling if the Individual Defendants cause the Company to terminate the Merger Agreement.

55. By agreeing to the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

56. The consideration to be provided to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

57. The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the merger.

58. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

59. Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

***The Registration Statement Omits Material Information, Rendering It False and Misleading***

60. Defendants filed the Registration Statement with the SEC in connection with the

Proposed Transaction.

61.    The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.

62.    *First*, the Registration Statement omits material information regarding Astoria's financial projections and the financial analyses performed by Astoria's financial advisor, Sandler O'Neill.  When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

63.    For example, although the Registration Statement discloses the Company's financial projections of non-GAAP net income and earnings per share for years 2017 to 2021, the Registration Statement fails to provide a reconciliation of all non-GAAP to GAAP financial metrics.

64.    With respect to Sandler O'Neill's Net Present Value Analysis of Astoria, the Registration Statement fails to disclose Sandler O'Neill's basis for selecting price-to-2021 earnings per share multiples ranging from 12.0x to 22.0x and price-to-December 31, 2021 tangible book value per share multiples ranging from 120% to 320% to derive the Company's terminal values.  Further, although the Registration Statement discloses that Sandler O'Neill selected discount rates ranging from 7.0% to 10.0%, which were "chosen to reflect different assumptions regarding required rates of return of holders or prospective buyers of Astoria

common stock," the Registration Statement fails to disclose those underlying assumptions and inputs to derive the discount rates.

65.     With respect to Sandler O'Neill's Net Present Value Analysis of Sterling, the Registration Statement fails to disclose Sandler O'Neill's basis for selecting price-to-2021 earnings per share multiples ranging from 12.0x to 22.0x and price-to-December 31, 2021 tangible book value per share multiples ranging from 120% to 320% to derive the Company's terminal values.  Further, although the Registration Statement discloses that Sandler O'Neill selected discount rates ranging from 7.0% to 10.0%, which were "chosen to reflect different assumptions regarding required rates of return of holders or prospective buyers of Sterling common stock," the Registration Statement fails to disclose those underlying assumptions and inputs to derive the discount rates.

66.     With respect to Sandler O'Neill's Pro Forma Merger Analysis, the Registration Statement indicates that, in arriving to its conclusion in this analysis, Sandler O'Neill utilized "certain assumptions related to transaction expenses, purchase accounting adjustments, an estimated dividend payout ratio, as well as certain cost savings and balance sheet restructuring assumptions, as provided by the senior management of Sterling."  The Registration Statement, however, fails to disclose these assumptions, which form the basis of Sandler O'Neill's analysis.

67.     With respect to Sandler O'Neill's Comparable Company Analysis of each of Astoria and Sterling, the Registration Statement fails to disclose the individual financial metrics for each of the selected companies observed by Sandler O'Neill in its analyses of Astoria and Sterling, respectively.

68.     With respect to Sandler O'Neill's Selected Transactions Analysis, the Registration Statement fails to disclose the individual financial metrics for each of the selected

transactions observed by Sandler O'Neill in its analysis.

69. The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) Opinion of Sandler O'Neill & Partners, L.P.; (ii) Unaudited Prospective Financial Information of Astoria; and (iii) Unaudited Prospective Financial Information of Sterling.

70. *Second*, the Registration Statement omits material information regarding Sterling's financial projections and the financial analyses performed by Sterling's financial advisors, RBCCM and Citi. The disclosure of this information is material to the Company's stockholders because, if the Proposed Transaction is approved by Astoria's stockholders and consummated, Astoria's stockholders will become stockholders of Sterling upon completion of the Proposed Transaction. As such, Astoria's stockholders are entitled to information relating to Sterling's financial projections and valuation analyses to enable them to make an informed decision with respect to the Proposed Transaction.

71. For example, although the Registration Statement discloses Sterling's financial projections of non-GAAP net income and earnings per share for years 2017 to 2023, the Registration Statement fails to provide a reconciliation of all non-GAAP to GAAP financial metrics.

72. Additionally, the Registration Statement indicates that, in performing their respective valuation analyses, each of RBCCM and Citi took into account certain synergies that could be achieved in connection with the Proposed Transaction, but the Registration Statement fails to quantify and disclose those synergies.

73. With respect to RBCCM's Discounted Cash Flow Analyses of Astoria and Sterling, the Registration Statement indicates that "RBCCM performed discounted cash flow

analyses of Astoria [and Sterling] by calculating the estimated net present value of the after-tax free cash flows of Astoria [and Sterling] available for dividends through 2021, based on Sterling's Forecasts." The Registration Statement, however, fails to disclose those critical after-tax free cash flows of Astoria and Sterling available for dividends through 2021, which were based on Sterling's undisclosed forecasts. Additionally, the Registration Statement indicates that RBCCM performed its Discounted Cash Flow Analyses of Astoria and Sterling using discount rates based, in part, on the use of equity size premiums, but the Registration Statement fails to disclose the amount of the size premiums included in each analysis.

74.    With respect to RBCCM's and Citi's comparable company analyses of each of Astoria and Sterling, the Registration Statement fails to disclose the individual financial metrics for each of the selected companies observed by RBCCM and Citi in their respective analyses of Astoria and Sterling.

75.    With respect to RBCCM's Selected Transactions Analysis, the Registration Statement fails to disclose the individual financial metrics for each of the selected transactions observed by RBCCM in its analysis.

76.    The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) Opinion of RBC Capital Markets, LLC; (ii) Opinion of Citigroup Global Markets Inc.; (iii) Unaudited Prospective Financial Information of Astoria; and (iv) Unaudited Prospective Financial Information of Sterling.

77.    *Third*, the Registration Statement omits material information regarding the process leading to the Proposed Transaction.

78.    The Registration Statement indicates that, on February 24, 2017, "Astoria

16

executed a mutual confidentiality agreement with customary standstill provisions with Party C." The Registration Statement, however, fails to disclose whether Party C's confidentiality agreement also contains a "don't ask, don't waive" provision that is preventing Company A from submitting a superior offer to acquire the Company, and whether the standstill and/or "don't ask, don't waive" provision terminate following the announcement of an acquisition.  Notably, it is likely such a provision does exist and do not fall away because Section 6.12(a) of the Merger Agreement provides that the Company "shall use its reasonable best efforts to enforce any existing confidentiality or standstill agreements to which it or any of its Subsidiaries is a party in accordance with the terms thereof."  Further, the Registration Statement indicates that Party B entered into a confidentiality agreement that contained a standstill provision that terminates upon the announcement of an acquisition, but the Registration Statement did contain a similar disclosure with respect to Party C's confidentiality and standstill agreement.

79.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the Background of the Merger section of the Registration Statement.

80.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:

81.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Astoria

82.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

83.     The Individual Defendants disseminated the false and misleading Registration

Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Astoria is liable as the issuer of these statements.

84.     The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

85.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

86.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

87.     The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

88.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

89.     Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

**Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Sterling**

90.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

91.     The Individual Defendants and Sterling acted as controlling persons of Astoria within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Astoria and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

92.     Each of the Individual Defendants and Sterling was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

93.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Registration Statement.

94.     Sterling also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

95.     By virtue of the foregoing, the Individual Defendants and Sterling violated Section 20(a) of the 1934 Act.

96.     As set forth above, the Individual Defendants and Sterling had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: April 10, 2017

**RIGRODSKY & LONG, P.A.**

By:   */s/ Timothy J. MacFall*

Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516

Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**OF COUNSEL:**

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800

*Attorneys for Plaintiff*